May it please the Court, my name is Jonathan Weissglass and I represent the Sierra Club petitioners. I'll be splitting my time evenly with counsel for the OIDA petitioners. Would the clerk please run it 10 and 10. May I ask a question at the very beginning? Yes, Your Honor. Why isn't this case moot with the Act of Congress? Well, that that is the first point I want to make. Thank you, Your Honor. I'll let you make it. And then after addressing that, I do want to address two issues from our briefs about the reasons that the pilot program does not comply with congressional standards. And those are, just to give a short preview, that the agency ignored safety standards that are imposed on trucks from Mexico are not as stringent as U.S. standards. And also that the agency rushed to start the pilot program and there won't be enough carriers for a long enough time to constitute a true test. But to turn to the the first issue, which I I think is is the critical issue at this point, and it has to do with the 2008 Consolidated Appropriations Act, which was enacted in December. Now, the case is not moot because the problem is the agency is not complying with the Act. They're continuing on. They're continuing on. Even with the low number of truckers, et cetera. That's right. The agency has has said that it is continuing to spend funds on the program, even though Congress said that the agency can't use funds to establish a cross-border pilot program. Now, establish, which is the word that Congress used, is a very broad term. It includes both the one-time act of initiating the pilot program, as well as continuing the pilot program. In our 28-J letter, we cited the dictionary definition of this. Counsel, could you back up to something for me? It keeps distracting me from listening to where you are now. I can't figure out what the Sierra Club is doing here. The standing isn't clear to me. I can see where the, I can understand the Teamster standing argument, whether its validity is demonstrated or not as one of the issues in the case. I just flat don't understand the Sierra Club argument. Certainly, Your Honor. We're not, in this case, we're only trying to show standing for the Teamsters. And as the court knows, only one petitioner needs to show standing. So are you in a micas or a party? The Sierra, I'm representing the Teamsters, the Sierra Club public citizen, all of the groups. For Sierra Club, does Sierra Club get attorney's fees if they win the case? Well, Sierra Club is treated just like any other some kind of environmental issue where an environmental organization would have members who are affected because of changes in the environment, and that would be their basis for standing. Of course, they can brief anything as in a micas, but in order to get attorney's fees, they have to be a party. The Sierra Club is a party. As long as one petitioner has standing, everyone is allowed to proceed. And the reason that one for all usually works is if you have, say, the Sierra Club is a party, and most Sierra Club members have never gone to this park and never will go and don't even know where it is, but one Sierra Club member files an affidavit saying I canoe there and this parking lot is going to ruin the view from the stream, then the whole Sierra Club has standing. That's the one for all. But here, Sierra Club having standing, it's like I was in a car accident, so Judge Hawkins brings a lawsuit. I think the standing, there's two issues. On standing, the issue is that as long as one party to a lawsuit has standing, that's all the court needs to look at. So if I was in a car accident with you this afternoon, my two colleagues could also be plaintiffs? Well, the two colleagues may not be able to get damages, but if they wanted for some reason, they could get attorney's fees if there was some sort of injunction. But in this case, I'm representing all the parties, so the issue of attorney's fees isn't an issue. Sierra Club is interested in this case because the same trucks that are less safe are also less environmentally sound, and they're concerned about air quality standards being degraded. That is Sierra Club's individual claim. I mean, if one person is hurt by the environment, that one person can represent them all. That's right. The issue in this case, though, really revolves around safety. Congress, to get back to the Appropriations Act, Congress cut off the funds because it was concerned the agency... Let me ask you about your statistical argument on safety. If I understand the argument right, you have two arguments here that seem intention to me. One is it's not enough trucks to do a statistically valid test, and the other is it's too many trucks because the safety and pollution aspects of these Mexican trucks creates too much of a harm to the United States. Well, it's two different issues. The number of trucks in the pilot program is very small, and therefore it's not a true test of the statistical validity, which is what Congress wanted. In our most recent filing, we showed that as of the end of January, there were only 13 carriers and 58 trucks. Since then, actually the largest carrier has withdrawn. There are now only 12 carriers and 42 trucks, and they're going backward. There's no way that this is going to be a true test of the statistical validity of the... Let me ask you about that now. The term statistical significance has a meaning that statisticians conventionally apply to it. It means that the event to be examined would happen less than 0.05, less than one time in 20. That's what you get with 42 trucks the same way you could with 42 coin tosses. If you toss a coin 42 times and it comes up heads 30 times, it's a statistically significant result because that will happen fewer than one 42 coin toss times in 20. Now, if you toss a coin 42 times a million times, you are sure to get a run of 30 heads out of the million 42 toss series, but it's statistically significant either way. You need, in order for it to have policy significance, you'd probably want to do more tests if you got a long series of heads out of only 42 tosses. But you've got statistical significance just by looking, you just test until you get to the point where the chance that it will occur randomly is less than one out of 20. Your Honor, the agency set a goal of 100 carriers in this program. The agency never considered that there would be so few carriers, 12, after five months of a one-year program. The failure to even address the possibility of such small numbers and what that means for statistics. What does it mean? I just raised this with you. What does it mean?  Let's suppose that with the 42 trucks, the accident rate is 10 times as high as with American trucks. Let's suppose, conversely, that the accident is the same as with American trucks or even lower. You're saying none of it means anything? The problem is you have to get a big enough sample in order to have it be representative. If you have a very small sample size, it's not like flipping a switch. The representativeness has to do with randomness and you'll probably never get that because you'll only get the best Mexican trucking companies who are prepared to go through all this proof that they have to of safety. You have to have at least enough to reach the statistical validity that Congress wanted. Well, statistical significance, you can get out of 42 trucks. You can get it out of 20, the same as you could with a coin. The sample in this case is not big enough. But let me turn... Why isn't it? I mean, I just explained to you why I think it is. So explain to me why you think it isn't. You've spent way more time than I have on this case, so you must have studied... I studied the probability and statistics so I could understand your argument. So I researched all that. You must have studied it a lot more than I have for this argument. Teach me. Certainly, Your Honor. First of all, it's the agency's responsibility to show why it's statistically valid and they completely failed in that responsibility and that's the entire issue. That's as far as the court needs to go. What do you mean by valid? Congress said it has to be statistically valid. I use the word statistically significant because I know what it means, .05. What do you mean? Your Honor, I have very little time left. Is it okay if I continue and still save some time for rebuttal? Whatever. Thank you. The point is, it's not like flipping a coin. The question is, do you have enough trucks that are representative of the trucks that are going to be coming in? And with only 100 that you need. The agency itself set this goal of 100 and they're nowhere close. Thank you, Counsel. May it please the Court, my name is Paul Cullen. I'm pleased to be here today on behalf of the Owner-Operator Independent Drivers Association. I have a question. Certainly. The record at ER 48 indicates that there are five states that are not ready to enforce safety rules. That's right. I was having a hard time getting whether the number was five, six, or seven, but apparently there are either four, five, six, or seven states that are not, who say they're not prepared to enforce safety rules. Do you know which ones these are, which states these are? I'd be glad to identify them afterwards. We can let you know. But I don't know off the top of my head. Do you know if any of them are border states? I think they are, but again, I'd rather be transparent. That's fine. If you don't know, that's fine. Go ahead. The FMCSA, as part of its demonstration project, has agreed to accept compliance with certain Mexican laws and regulations in lieu of compliance with American laws and regulations. There's absolutely no statutory authority that would permit the agency to do that. All of their authority points decisively in the other direction. It simply lacks the authority. 49 U.S. Code 1392A.1 and 4 creates ministerial functions on behalf of the owner-operator of the agency. They can grant operating authority if a carrier is willing and able to follow American law and regulations under A.1. They must deny operating authority if the carrier is not willing to and able to follow American law. Can you cite and brief the major safety differences between the Mexican law and the American law, the United States law? Certainly. The U.S. law, we can start first with commercial driver's licenses. American law is very, very clear. You must have a CDL in order to operate a commercial truck in the United States. That law, 49 U.S. Code 31302, was adopted after the United States 1991 Memorandum of Understanding, which the agency points to frequently. Also after that 1991 MOU, the U.S. statute established a criteria for disqualification, and it said, we will consider unsafe conduct while operating a private vehicle, not a commercial truck, because risky behavior there is an indication of risky behavior behind a commercial truck. Mexico has no counterpart. Everyone recognizes that those laws are different. If you look at the drug and alcohol testing, take a look at 49 U.S. Code 31306 and the U.S. statute. They are not only tampering with regulations, they are allowing Mexican carriers to come in here without obeying statutory law. Not just the regulations, but statutory law. Hasn't the agency accepted Mexican CDLs for some time? As I said, they had a 1991 MOU, which has not been looked at since then. But the 13902, which I referred to a moment ago, was very different in 1991. If you look at the codification of that, in the 1990 U.S. Code, it's at 49 U.S. Code 10922B, there was broad discretion back in those days as to whether to grant or not grant operating authority, including public convenience and necessity. In 1995, they changed that to the law that we now have, which the Solicitor General says provides only a ministerial function and does not allow the agency to determine the terms and conditions under which foreign carriers can come here. We have that in our Rule 28J submission last Friday. So that 13902 is dramatically different today than it was in 1991. The mandatory CDL rule, you must have a commercial driver's license, that was enacted in 1995. And the whole regime within this country, as to federally mandated CDLs, was dramatically changed after that As I said before, the prior private vehicle violations was imposed on U.S. drivers and not on Mexican drivers. Counsel, I've got something else that's bothering me. Let me lay it out for you so you can assuage my concern. As I understand it, the problem that the independent truckers have is twofold. One is safety on the road, and another is economic harm to the independent truckers from the competition with Mexican truckers. We rely primarily on safety in this case. My thought was Congress already made the decision back in the 90s with NAFTA on the economic harm. And on the safety, since 1982, Mexican truckers have been free to drive in and out of the United States and have been doing so, and without any pilot program restrictions or anything else. It's just that they're limited to, I think, 25 miles from the border. So I don't get where the safety concern attaches to this pilot program, where a tiny number goes further north, as opposed to the way things have been since 1982, which is coming 25 miles into the country. Well, if you're directing your attention to the standing argument, we presented statistics in response to the government's belated request there. One of the carriers, Trinity Industry, had 75 out-of-service violations, and another 476 violations that should have put them out of service. And an out-of-service violation involves an imminent hazard, an increased likelihood of serious injury or death. Well, they inspect them off the border and turn them away if they don't pass, don't they? These people came over, and they were inspected in this country and put out of service. These people were passed the passive, the so-called passive. Was this under the 82, you can come 25 miles in, or are you talking about? It was under the 82, come 25 miles in. They were inspected, and they were found. So that's not this program. That's a program that's not being challenged now. These trucks came in, and they were in deplorable condition. The drivers were not trained properly. They didn't understand the regulations. They couldn't speak English. My interest is actually, I think, consistent with yours, and that suggests to me I'm not understanding something. It sounds like right now you've got a lot of unsafe Mexican, from what you're saying, you've got a lot of unsafe Mexican trucks on the road because of a program that's been in place since 1982 that they can drive 25 miles in. Well, this program has all this elaborate border inspection, and in order to come in under this program that you're challenging now, you can't have those unsafe trucks coming in. The question here is not whether a given truck will pass or fail an inspection. The potential that they will fail goes to our standing. But whether or not they pass or fail, the agency has no discretion to impose. And under 39902A1 and 4, the agency simply has no discretion. They must let them in if they qualify under U.S. law, if they're willing to obey that. The problem is, we know that the agency has announced that it will accept compliance with laws, drug testing, and medical fitness. The Solicitor General says that this agency performs a ministerial function. They have no authority to change or alter the terms and circumstances under which these carriers can come in here. They are paper pushers. And their action, in the old case that this panel is familiar with, the public citizen case, their action was so narrow and bureaucratic that it didn't constitute major federal action subject to the National Environmental Policy Act. Only the President's action of lifting the embargo would be subject to that, and of course the President is exempt under NAFTA, under NEPA rather. And so the Solicitor General has put the agency in a nice little box. Ministerial action, no discretion, you are not allowed to change the terms and circumstances under which foreign carriers come in here. You are bureaucrats, you are ministers, you have no discretion. The only conceivable way that they could allow compliance with Mexican statutes and regulations to satisfy U.S. requirements is by way of the exemption process, a process that the U.S. court that it did not follow. And why didn't it follow it? Because if it had followed it, it would have had to publish important information for a wider and its 161,000 members to read and digest. It would have had to publish all the records that it have that bear on safety, and it would have had to listen to our comments and make a reasoned decision based on those. I'd hope to save a little rebuttal time, but I'll pray for that later. Thank you, Counsel. Thank you, Your Honor. I realize that both of you went all through your time and have no rebuttal time, but it seems like it's a substantial and interesting case, so why don't you prepare so that you'll have one minute of rebuttal time each anyway. Thank you, Your Honor. May it please the Court, I'm Irene Sollett representing the Department of Transportation. Can you answer the question I posed at the start of the second? Yes, Your Honor. It's my understanding that there are not any border states among those that you're asking about. So the five states that say they can't conduct safety inspections are in board, if you will. Right, Your Honor. It's not Texas, New Mexico, Arizona, California. I also would point out that even as reflected in the IG report, I don't believe they said they're not prepared to conduct safety investigations. They said they had some question about their enforcement ability. And I would note, as we noted in a footnote in our brief, that the obligation there under the statute, the thing that has to be in place or ready, is that they can enforce or notify DOT of violations. This is the kind of enforcement that states do all the time. They're enforcing the same requirements, essentially, and in addition, as they do ordinarily with respect to American carriers. But also, since the time of the IG report, the Department of Transportation has undertaken considerable additional communication and training with state enforcement authorities on the particular issues that they had questions about, which are English language proficiency and point-to-point restrictions. So the big difference between the border zone, which has been Mexican trucks have been coming in since, what, 82? Well, the moratorium was in 82. Before 82, there was no restriction on Mexican trucks doing long-haul trips in this country. The difference between it and the pilot program is the pilot program would allow these trucks to go past that border zone into the interior of the United States. That's correct. And although neither of you have at the tip of your tongue which states have said they're not ready to enforce safety rules, presumptively, some of those trucks would drive into states that have told us they're not ready to enforce safety rules, correct? That's correct, Your Honor. And my understanding of the record was they said they had neither the staff nor the money to do it, indicating that they would not do it. With respect, Your Honor, maybe your recollection is better than mine, but part of the IG report that I'm recalling was simply the IG recounting that officials in five states had indicated that they had questions about their ability to enforce the regulations against carriers, long-haul carriers from Mexico. But I would note, again, that what the statute requires is that they be prepared to enforce or to notify the Department of Violations. And, again, the Department has understood that. So how will they know of the violation? They can inspect, Your Honor. They don't have the staff or the money to do it. It was my understanding. So saying that they could notify DOT doesn't help me. Well, again, Your Honor, I don't have a specific recollection about the staff point. I'll look it up. I may misremember. Tell us what it means in practical terms. I'm thinking Mexican truck drives into Alaska. I don't know if it's economically practical for them to get that far. Can't find anyone who speaks Spanish anywhere near Northway or Tok where they drive in. Common problem, getting Spanish interpreters in Alaska. What happens? Your Honor, the answer to that is that Mexican long-haul carriers who cross the border between Mexico and the United States headed to Alaska or any other state are examined at the border. And each of those trucks has a distinctive identifier for the inspector to see. So they know it's a long-haul carrier. Okay, Tok border station, they don't get a lot of traffic, they've got all the time in the world, but nobody speaks Spanish. What happens exactly? What I began to say was that at the border with Mexico, there is an interchange between the U.S. inspector and the Mexican driver. That interchange covers three things. He has to determine that the driver has a valid commercial driver's license from Mexico. He has to determine that the truck has a valid, that is issued within the last three months, safety inspection decal, and he has to have sufficient conversation with the driver to conclude that that driver is able to communicate in English. So if that driver is not able to communicate in English, he will be stopped at the border with Mexico. He will not get to the interior of the United States and to Alaska. So that's the control on that problem. And I would add, Your Honor, that so what you're saying is that for the five states, I don't know if Alaska is one of them or not. I was just hypothesizing. But for the five states, what you're saying is if they didn't have the CDL and the truck safety and the English language ability, they'd never get to those five states. They should be stopped at the border. They should be stopped at the border. And I would add also, Your Honor, just as a practical matter, there are many Spanish-speaking citizens of the United States, and English language proficiency is an issue with respect to some American citizens, people who validly work in this country and drive American trucks. So this is not an unknown problem to state enforcement. At the risk of running out of time, I'd like to ask a question that bothers me. Isn't the congressional intent behind Section 136 unambiguous? It says, none of the funds made available under this act may be used to establish a cross-border motor carrier demonstration program. If you look at the legislative history, including remarks by both proponents and opponents of the program, clearly indicates in the record that the intention was to halt the pilot program. Your Honor, obviously the government disagrees. That's why the program right now is continuing. There are several reasons why we disagree. First of all, just as a matter of dictionary definitions, and I know that this is a problem courts often face, everybody can come up with a definition that's advantageous to them. But we've certainly presented the Court with a reputable definition that would be much narrower than the one Sierra Club is urging. But in addition, and I think probably more importantly, there are other indications in the statute itself that indicate that the Secretary's interpretation of the new funding provision is a valid one. For one thing, the preceding section of the statute, Section 135, perpetuates the two major provisions containing multiple restrictions that Congress has imposed on cross-border trucking in general with Mexico and on the demonstration project, are perpetuated. And the only function that 135 could possibly serve, that Sierra Club has pointed out in its 28-J response, is one subsection of one of the two statutes which bars cross-border trucking in general absent a demonstration project first. So what that means is that the combination of 135 and 136 together would be saying no cross-border trucking without a demonstration project, 135, no demonstration project, thus no cross-border trucking. If this is what Congress meant to do and it meant thereby to turn its back on an undertaking that it made in approving NAFTA, much more clarity from Congress should be expected before the Court would interpret a statute to be in derogation of an international agreement. And there's one more very important point on this statutory interpretation question, and that is that there are two other parts of the same funding bill, and one of them is in the DOT section. These are referred to in our response on the 28-J letter, which used the language that the Petitioners would have the Court read here, which is establish or implement. There were funding restrictions, and in those instances Congress said establish or implement. Here, not only is that not what the statute as enacted says, it says just establish, but the bill as it came out of the House said establish or implement. It came out of the Senate saying only establish and out of the conference saying only establish. What the Secretary has done here is made a good-faith interpretation of the statute, which is well borne out by its literal terms, by the course of its enactment, and by the Secretary's obligation to consistent with other. I want to make sure I understand this. Where 136 says none of the money may be used to establish a demonstration program, you're suggesting that to avoid absurdity we should read it to mean you can't establish a new one, but you can implement the one you've got. You can continue the one that was established in September of 2007, but you can't establish a new one. And another indication that that's not a nonsensical interpretation. So continue the one you've got, don't establish a new one. But you can't start a new one. And if you look at section 6901 of the 2007 Act, which is one of the two statutes perpetuated by section 135 of the new spending legislation, you'll see that Congress in May of 2007 understood that there might be additional demonstration projects in the future. The old one, I get lost if there are too many words between my question and the answer in the next question. So I should read established to mean start a new one. Now, the old one is the one that's being litigated today? That's correct, Your Honor. And that was established when? September of 2007. You, like Justice Scalia, suggest we're going to ignore legislative history. Senator Dorgan explaining that the amendment means DOT may not go forward with this pilot project. Senator Lott, the provision would stop this temporary pilot project. Your Honor, what I would say, and I'm not asking the Court to sign on to an approach that says legislative history is immaterial, should never be looked at, is irrelevant. What I am saying is that faced with what we think is a clear meaning of the word established, based on the interpretation of this provision in the context of the preceding provision and what the relationship between the two is, and I think this is very significant. There are other provisions, funding restrictions, in this same spending bill that use the larger phrase establish or implement. And so it is not unreasonable at all for us to be asking the Court to interpret establish in this provision, in 136, differently than establish or implement in those other funding restrictions. Those other funding restrictions have a broader scope, we think, than this one did. And so as to the comments of individual legislators, I'm not telling the Court they should never be considered. But what I am saying is 136 should not overcome. All right. I'll proceed with one more question. Yes, Your Honor. If we disagree with you and we find that 136 invalidates this program, does that render this case moot? I believe I would agree that it doesn't render the case, well, it would, I believe, relieve the Court of the need to decide the other issues, if that's what the Court is asking. I don't see that the Court would have any reason to address this fully on the merits if it decided that the project could not go forward because of the funding restriction  All right. Thank you. We've been talking about what words in the statutes mean. Yes, Your Honor. I'm now referring to the notice of comment provisions for HASA, preauthorization safety audits. What does the agency think the words prior to initiation mean? You're looking at in the title? Congress has said you're supposed to do these preauthorized HASAs and they use the words prior to initiation. What does the agency think that means? I just want to make sure I'm looking at the same provision you are. Is this in 6901A, no, excuse me, B? I'll save you some time. I don't know where it is. Is it the one that requires the Secretary to publish comprehensive data and information on preauthorization safety audits conducting before and after the enactment of this Act? That's the one you're looking at? Yes. Your Honor. I want to know what the agency's interpretation of prior to initiation means. What I read here and what we discussed in our brief is that it says comprehensive data and information on audits conducted before and after the date of enactment of Mexico, motor carriers domiciled in Mexico are granted authority to operate beyond the United States municipalities and commercial zones on the U.S.-Mexican border. That publication, maybe we're talking about different provisions here, but the requirement to publish the PASA information for comment we believe is properly interpreted as a requirement that all PASA information on carriers be published before they enter the program. We don't see any requirement in the statute that says all eventual participants have to be, the PASA information on all of them has to be published before the project can begin. Is that why Congress used the word audits, plural? The word audits, Congress required there to be safety audits in another of these many provisions. And what this provision... Why did they use the word comprehensive? Because the PASA itself is a very comprehensive process. There's a lengthy listing in the statute itself of all the many provisions that all the many aspects of carrier operations that it has to cover. The agency's interpretation of this congressional provision is that these PASAs only have to be done as each truck comes in or each carrier is approved? Each carrier gets authorized. The way this works is the carrier applies for authorization to engage in long-haul operations in the United States. That triggers a need for a preauthorization safety audit, a PASA. All of these are being done on-site in Mexico by DOT. So the way this works is the pilot program exists, but before a truck carrier, a carrier's company that has trucks can send trucks into the U.S. under the pilot program, American inspectors go to Mexico and check out the company and its trucks? That's correct, Your Honor, on every one. And they also publish this information before that carrier starts operating. I want to just, if I may, make one point, because it's something that came up in the reply brief that we haven't had a chance to address and I think it's important for the Court to be aware on. I believe one of you mentioned earlier it as an issue that you were concerned about, or maybe that my opponent said he was going to talk about it. That is the import question, whether or not trucks participating in the demonstration were actually. I don't recall them arguing anything about imports. They didn't bring it up in the oral argument. Let me just say, if you're concerned about that when you read the briefs, their position that the statute was changed with regard to the word import is wrong. The statute involved 49 U.S.C. 30112 said import. When it was enacted in 66, it still says import. Do I have this right? Import means they would be selling the trucks, not just driving them. That's right. If a container ship comes into Oakland to unload goods from China, in general, one does not interpret the word import to mean that that container ship is being imported. It's the goods on the ship that are being imported. One other thing I wanted to ask you about, counsel. Notice in comment with respect to Mexican laws and regulations, there is a congressional requirement that the agency determine and then publish the results of a comparison of United States requirement, law and regulation requirements, and those in Mexico. Is it the agency's position that this chart they put out? I think it's in the record. It's in the June 8th notice, Your Honor. Yes. June 8th notice that that complies? Your Honor, the agency's position is that that's part of the compliance, but that the agency's disclosure of an analysis is really ‑‑ it extends to the text of the notices that the agency has published. Just as an example, I would point out that that chart discusses medical qualifications as one point on which they're going to accept physical examinations from Mexico, and it points out that both countries have comprehensive physical and mental examinations, and it points out a few differences on the Mexican side. If you look at the text that precedes that table, it tells you, for instance, that the medical examination required for commercial drivers in Mexico is the same medical examination as required for airline pilots. So I believe that reflects the agency's conclusion that if a medical examination is sufficiently comprehensive and thorough to qualify a pilot for a commercial airline, that is the kind of examination that they will accept as comparable. Is the listing complete? I mean, the requirement from Congress was that this would lay out, that the agency would lay out what the U.S. requirements are, and then side by side the Mexican equivalent so that the ‑‑ is it the Secretary of Transportation can say they're equivalent for the purpose of the congressional requirement. Is that right? Your Honor, the analysis is one that the agency undertook. I believe that the chart and the text in the various notices that go along with it are sufficient to meet that requirement. Are there parts of it that are in Spanish? Parts of the requirements that are in Spanish. Were the description of what the requirements in Mexico are, are they printed in Spanish? They are not printed in Spanish in any notice. Okay. Let me just ask again, if we're talking about PASA, the preauthorized safety audit, I thought it was not only supposed to be published, but there was supposed to be opportunity for public comment. There is, Your Honor. And was there? Would that have to take place? With respect to every carrier that has entered the program so far, and there will be with respect to every future carrier. And each carrier, there are actually two opportunities for comment. There is, in the normal proceedings of DOT, when a carrier, American carrier, Mexican long-haul carrier, applies for operating authority, FMCSA has an online register. It publishes on that online register the carrier. There's a 10-day comment period then. Then, in the case of these Mexican carriers, there's the PASA process. And in the PASA process, the PASA information is published, there is a comment period identified in the Federal Register for people to comment. How long a period is that? Your Honor, I will have to look. Well, you know the record better than I. Would it be the same 10 days, do you think? I will have to look and check. All right. I can look that up. Thank you. Thank you. Thank you, counsel. I want to address the funding cutoff first. The tools of statutory construction that the government alludes to are meant to be used in order to ascertain what Congress's intent is. In this case, the legislative history for which the government has no explanation is crystal clear about what Congress's intent is. I read Scalia's book and had a little bit of experience with legislative history. People often get somebody to say something on the floor or in a committee report when they could not get it into the bill. In this case, there is not a scrap of evidence cutting the other way. And this Court has made very clear, for instance, in the bill. You get what you want in the bill, you keep your mouth shut. Your Honor, the critical thing is to effectuate congressional intent. Congressional intent points only one way in this case. And this Court has made clear, for instance, in the class action plan. I don't understand why. I mean, if they say establish and implement all over the place and then they say establish in one place, why isn't that a fair basis for interpretation? Because those are tools of statutory construction to try and figure out what Congress meant when it's unclear. In this case, everyone agrees what Congress meant to do. It was to cut off funding for this existing pilot program. Are you saying you should only look at the statute if the legislative history is ambiguous? No, no. I'm saying when the statute is ambiguous, you go to the legislative history, and the legislative history is crystal clear. In fact, even when the statute is not ambiguous, courts go to the legislative history because they're wanting to effectuate congressional intent. Well, you're saying that the statute is clear and is supported by legislative history. I'm saying that at least the statute is ambiguous, and in that case courts go to the legislative history. The second point I want to make goes to Judge Nelson's question about the major safety differences here. The critical one that I see is that Mexico does not disqualify drivers if they have offenses in their personal cars, such as DUIs, reckless driving. But in the U.S., we do disqualify drivers from driving trucks for those offenses in their personal cars. That is a major safety difference. You don't lose your commercial driver's license in Mexico for drunk driving? That's right. They don't have to take into account what you do on your own time, only what you do when you're in your commercial vehicle. And that is a critical safety difference, and the agency just says everything's equivalent, it's the same level of safety. But they never explain what that means for safety. And the third point I want to make goes back to the statistical validity point. Congress specifically said that it wanted, and I'm quoting, a reasonable number to yield statistically valid results. And this gets to Judge Kleinfeld's comments. A reasonable number. The agency never explains how going so far under the 100-carrier goal is a reasonable number. Do you want more Mexican trucks coming into the country? There would have to be more in order for it to be statistically valid results. Now, those trucks have to be safe. Every one of them has to meet Congress's minimum safety requirements. But there has to be enough for it to be statistically valid. So the issues are not in conflict. So for each of these reasons and the other reasons we laid out in our briefs that obviously I don't have time to go into, we believe that there needs to be an immediate injunction to prevent this pilot program from continuing, and at the least there should be an injunction before the end of the year is up and they go ahead and decide to open the border based on the flawed pilot program. Thank you, Kevin. Thank you. I sat at council table waiting, I must say impatiently, for the government to answer the key issue here, and that is 13902. 13902 does not authorize the agency to accept compliance with Mexican statutes and regulations in lieu of compliance with U.S. statutes and regulations, period. The only conceivable way that they could substitute compliance with Mexican statutes and regulations for compliance with U.S. statutes and regulations is by way of the exemption process, 31315B. They did not follow the exemption process, and if they had they would have had to give significant procedural and substantive rights to interested parties. They would have had to publish safety analysis studies, give the opportunity for comment and all that. They admit, there's no question here, they did not grant exemptions, and that's the only conceivable way they could say, well, there are certain laws and regulations that they needn't follow under 13902A.4 because they went through the formal exemption process. That's the only conceivable way they can get around what the U.S. Supreme Court made crystal clear in Public Citizen and what the Solicitor General made crystal clear. They have no discretion to alter the terms and circumstances under which foreign carriers can come in here. And finally, the 2008 Appropriations Bill. At best, this is an alternative way to rule in our favor, but that bill expires on October 1st. Now, I like coming to San Francisco, but I don't want to come back here, force you to read these briefs again and go over the merits of the underlying unlawful conduct here. This case will not be mooted if you rule in our favor on the Appropriations Bill. Further than that, this is a very important matter of national policy. It is likely that the Solicitor General would seek certiorari of any ruling in isolation on that, on a very touchy question of statutory interpretation. You owe it to us and to the Supreme Court and to the country to resolve all of the issues that have been presented to you so that in the event it does go up on a question of statutory interpretation, with all of the wonderful things that you've read in Justice Scalia's book, that they have the whole record and they can once and for all recognize that they have to follow their prior holding in public citizen. Do I understand correctly you would just as soon not win on the mootness theory based on the 2008 Appropriations Act because you think it just means you're going to have to do all this again and waste everybody's time? I'd be delighted to win on that. I'll take a win any way we can get it, Your Honor. But I think that in the interest of judicial economy and efficiency and the likelihood that a decision so narrowly focused could go to the Supreme Court and be so inconclusive in terms of the real issues that are here, that it would be unwise to focus an issue so narrowly. We agree with the position taken by Teamsters and Public Citizen and whatnot on that issue, but we certainly encourage you to decide all the issues in the case. It's simply too important to push this case to one side on such a narrow basis, which is likely to be... As they say, capable of repetition. Capable of repetition because come October 1st, they will be completely free of the restraints here. Thank you very much. They're going to be out of office soon. Who knows what NAFTA policy is going to be? One can always talk about repetition. It seems like this has not been a history of repetition. It's been a history of changing national policy on free trade. I think there's certainly that element there, and one would hope that wiser hands would reexamine these policies at some point in time. But the people who are in charge of FMCSA are going to be there certainly until January, and they could make a final determination based on the data that they've gathered thus far. I don't want to burden the Court, but I have five states to read to you if you'd like to hear it. Sure. Nebraska, Nevada. Nevada. Nevada. Montana. Montana, Rhode Island, and Utah. Maryland did not respond. This will be found in the September 6th IG report that's in the record. Alaska's prepared. Thank you. That's nice to know. Well, Alaska's always prepared. We know that. Thank you, Counsel. Thank you, Your Honor. Sierra Club v. DOT is submitted.
judges: Nelson, Kleinfeld, Hawkins